### IN THE

## SUPREME COURT OF ERRORS,

### HOLDEN AT NEW-HAVEN, IN JUNE, 1811.

—————

### PRESENT,

The Hon. STEPHEN MIX MITCHELL, Chief Judge,
TAPPING REEVE,
ZEPHANIAH SWIFT,
JOHN TRUMBULL,
WILLIAM EDMOND,       } Judges.
NATHANIEL SMITH,
JEREMIAH G. BRAINARD,
SIMEON BALDWIN,
JONATHAN INGERSOLL,(a)

—————

### BROWN and others *against* UNION INSURANCE COMPANY OF NEW-LONDON.

THIS was an action on a policy of insurance to recover for a loss of the cargo of the ship *Franklin*.

The insurance was stated to have been made for the sum of four thousand dollars of said cargo at and from *Martinique* to the port of destination in the *United States*, " from the dangers of the seas, fire, enemies, assailing thieves, restraint and detainment of princes and people, of what nation or quality soever, *barratry of the master or mariners,* (unless the assured were owners of the vessel,) and from all other misfortunes and losses that should come to said cargo." The declaration then stated, that the *Franklin*, being laden with a cargo to the

*Margin note:* Resistance by the master and mariners of a neutral vessel, to the search of a belligerent, is barratry.

(a) Appointed *May* Session, 1811, in the place of Hon. *John C. Smith*, appointed Lieutenant Governour.

Vol. V.                    A

June, 1811.

BROWN
*v.*
UNION INSUR-
ANCE Co.

amount of ten thousand dollars, on the first day of *November*, 1808, sailed from *Martinique* for the *United States*, and on the voyage, was captured by certain vessels of war belonging to his *Britanic* majesty, and by them was held in custody, so that the cargo was lost to the plaintiffs. There was a count, also, stating the loss to have been by the *barratry of the master and mariners*, in this, " that the master and mariners did, within and during said voyage, resist the capture and search of his majesty's brig of war *Ferret*, by means of which said cargo was afterwards, by the brigs of war *Melpomene* and *Circe*, wholly detained from the plaintiffs, and lost."

The general issue was pleaded, and on the trial, the plaintiffs, to make out their case, proved the execution of the policy; their property in the cargo; that the vessel was owned by *Elisha Denison* and by *W.* and *S. Robinson*, citizens of the *United States ;* that a capture was made as stated in the declaration; and that they had duly made an abandonment to the defendants. There they rested their case, claiming as for a total loss.

The defendants, in their defence, proved a capture by a *British* ship of war; a rescue by the master and mariners, a re-capture by another *British* ship of war; and produced a copy of a condemnation passed in the court of vice-admiralty in *Gibraltar*, in which the ground of condemnation was stated as follows : " Pronounced the said vessel called the *Franklin*, and her lading, to have been unlawfully rescued and retaken, by the master, from the possession of the prize-master and others, put on board thereof, from his majesty's sloop-of-war *Ferret*, *Wells*, commander, whilst proceeding to a *British* port for adjudication, and as such, or otherwise, subject and liable to confiscation ; and condemned the same as good and lawful prize to our sovereign lord," &c.

On these facts the court charged the jury, that the plaintiffs were by law entitled to recover. The jury found a verdict in favour of the plaintiffs accordingly ; and the defendants moved for a new trial on the ground of a misdirection. The question being reserved for the consideration of the nine judges.

*Goddard* and *Law*, in support of the motion, contended,

1. That the resistance to a search, by the master and crew of the ship *Franklin*, and the forcible rescue of such ship, after capture, was a breach of neutrality.

The sentence of condemnation pronounced by the court of vice admiralty, at *Gibraltar*, is conclusive evidence on this point. It appears on the face of it, to have been passed by a court of competent jurisdiction, and upon grounds warranted by the law of nations. *Bolton* v. *Gladstone*, 1 *East*, 155. *The Maria*, 1 *Rob. Adm. Rep.* 287, 314, 315, (*Amer.* edit.) *Garrels et al.* v. *Kensington*, 8 *Term Rep.* 230. *Barker* v. *Blakes*, 9 *East*, 283. *Church* v. *Hubbart*, 2 *Cranch*, 234, 235. *Bas* v. *Tingy*, 4 *Dall.* 43. *Vattel, B.* 3. *ch.* 7. *s.* 114. 1 *Marsh.* 434, 435, *a.* (*Condy's* edit.)

2. That the acts of the master and crew in resisting a search, and rescuing the ship out of the hands of the captors, were justifiable, and not barratrous. *Nutt* v. *Bourdieu*, 1 *Term Rep.* 323. *Vallejo* v. *Wheeler*, *Cowp.* 143. *Phyn* v. *The Royal Exchange Assurance Company*, 7 *Term Rep.* 505. 2 *Marsh.* 515. *a. Abbott*, 194. (*Story's* edit.) *Lex Merc. Amer.* 279. *Crousillat* v. *Ball*, 4 *Dall.* 294. *Hood's* Executors v. *Nesbit et al.* 2 *Dall.* 137. *The Two Friends.* 1. *Rob. Adm. Rep.* 232. 233. (*Amer.* edit.) *Vos and Graves* v. *The United Insurance Company*, 1 *Caines' Cas.* 11. *Kendrick* v. *Delafield*, 2 *Caines' Rep.* 67. *Thurston* v. *The Columbian Insurance Company*, 3 *Caines' Rep.* 89. *Park*, 84, 364. *Stamma* v. *Brown*, 2 *Stra.* 1173.

*Daggett* and *Gurley*, in behalf of the plaintiffs, contended,

1. That the conduct of the master and crew, in resisting a search and rescuing the ship, was not in violation of the law of nations, nor a breach of neutrality; and that the decree of condemnation was not conclusive upon this point. 2 *Marsh.* 507. (*Condy's* edit.) *Elting et al.* v. *Scott et al.* 2 *Johns. Rep.* 163. *Dawson* v. *Atty*, 7 *East*, 367.

2. But if it should be deemed that such conduct of the master and crew created a forfeiture of the rights of neutrality, then in that case, it constituted the crime of barratry;

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

and that therefore, the insured were entitled to recover. *Vallejo* v. *Wheeler*, 1 *Cowp.* 143, 150, 156. *Moss* v. *Byrom*, 6 *Term Rep.* 379. *Earle* v. *Rowcroft*, 8 *East*, 126. *Marsh.* 515. *a. et seq.* (*Condy's* edit.) *Knight* v. *Cambridge*, 1 *Stra.* 581. *Abbott*, 194, *in nota.* (*Story's* edit.)

INGERSOLL J. This was an action brought by *Jesse Brown* and *Son* against *The Union Insurance Company* in *New London*, (the same being an incorporated company for making marine insurance,) to recover for a loss of the cargo of the ship *Franklin*. The declaration stated, that on the 5th day of *August*, 1808, the plaintiffs were owners of the cargo to be shipped on board of the ship *Franklin*, then lying and being at the island of *Martinique*, in the *West Indies*, or bound to *Martinique*, and from thence to her port of destination in the *United States*. That the plaintiffs proposed to said company, to assure them four thousand dollars of said cargo, to be shipped on board of the *Franklin*, after the same should have been shipped, at and from *Martinique*, to her above port of destination; and, that the cargo so to be shipped, they would warrant to be *American* propery. That said company, for a *premium* of nine *per cent*, by a policy of insurance duly executed, did assure to the plaintiffs, the sum of four thousand dollars of the above mentioned cargo, at and from *Martinique* to the port of destination in the *United States*, " from the dangers of the seas, fire, enemies, assailing thieves, restraint and detainment of princes and people, of what nature or quality soever, barratry of the master or mariners, (unless the assured were owners of the vessel,) and from all other misfortunes and losses that should come to said cargo." The declaration then stated, that the *Franklin*, being laden with a cargo to the amount of ten thousand dollars, on or about the 1st day of *November*, 1808, sailed from *Martinique* for the *United States*, and on the voyage was captured by certain vessels of war belonging to his *Britanic* majesty, and by them was held in custody, so that the cargo was lost to the plaintiffs. There was a count also, stating the loss to have been by the barratry of the master and mariners, in this,

" that the master and mariners, did, within and during said voyage, resist the search and capture of his majesty's brig of war *Ferret*, by means of which, said cargo was afterwards, by the brigs of war *Melpomene* and *Circe*, wholly detained from the plaintiffs, and to them lost," &c.

The plaintiffs, to make out their case, produced the policy of insurance, duly executed by said company, in which it appeared that said company made the insurance as above stated. They also proved their property in the cargo, and that the vessel was owned by *Elisha Denison* and *W.* and *S. Robinson*, citizens of the *United States ;* and that a capture was made as stated in the declaration ; and that they had duly made an abandonment to the defendants. They then rested their case, claiming as for a total loss.

The defendants, in their defence, proved a capture by a *British* ship of war ; a rescue, by the master and mariners ; a re-capture, by another *British* ship of war ; and produced a copy of a condemnation passed in the court of vice-admiralty at *Gibraltar*, in which the ground of condemnation was stated as follows, to wit, " Pronounced the said vessel, called the *Franklin*, and her lading to have been unlawfully rescued and retaken, by the master and others, put on board thereof, from his majesty's sloop of war *Ferret*, *Wells*, commander, whilst proceeding to a *British* port for adjudication, and as such, or otherwise, liable to confiscation ; and condemned the same as good and lawful prize to our sovereign lord the king", &c.

There was in the court below, a verdict and judgment for the plaintiffs to recover their loss aforesaid ; the court directing the jury to return a verdict in favour of the plaintiffs on the aforesaid facts. The jury accordingly so returned their verdict, on which, the court as above stated, gave judgment in favour of the plaintiffs.

The defendants below, to wit, said insurance company, moved for a new trial, on the ground, that the direction of the court was wrong ; and prayed to have the question reserved for the opinion of this court, whether there ought not to be a new trial of the cause ?—It was argued in favour of

June, 1811.

BROWN
*v.*
UNION INSUR-
ANCE CO.

a new trial, by the counsel for the insurance company, that the decree of condemnation by the court at *Gibraltar*, was conclusive evidence of resistance to a search, as it appeared by the decree, that the taking and holding in custody, on the part of the captors, was for the purpose of ascertaining the fact, whether or not there was enemy's property on board? It was further argued, that the rescuing the ship out of the hands of the captors, by the captain and crew, proved, conclusively, a breach of neutrality.

Upon this state of facts, it was urged, that there could be no recovery, unless the rescuing by the master and mariners should be considered as barratry, which, it was said, it clearly was not, as it must be supposed to have taken place for the benefit not only of the master and mariners, but also of the owners.

On the part of the plaintiffs, it was urged against a new trial, that the decree of condemnation did not decide the question of neutrality, as resistance to a search was justifiable ; but at any rate, if it was not so, it amounted to barratry, and on that ground, it was said the judgment was right.

My opinion is, there ought not to be a new trial, and on the ground that the rescuing and retaking of the ship *Franklin*, was barratry in the master and mariners. In order to determine whether such rescuing and retaking was barratrous, it may be necessary to take into consideration the right of search. This right, though at various times disputed, yet is now established in *Great-Britain*, by various decisions of the courts of that country, founded, as is supposed, on the law of nations.

A very pointed decision in favour of this right, and that resistance to a search is a breach of neutrality, is found in the case of *Garrels et al.* v. *Kensington*, 8 *Term Rep.* 230. That was a case of capture, rescuing and afterwards a recapture, and a condemnation on the ground " of a violation of neutrality, by means of the rising of the master, supercargo, and crew of the captured vessel, on the captors, and retaking the vessel ; declaring the same also to be contrary to the law of nations, and the faith of treaties." The action

was brought against the underwriter on a policy of insurance on goods; the cargo on board the vessel was captured and condemned under the above circumstances. Indeed, the question in that case was much the same, if not precisely the same question which is made in this case, except, that there was no averment in the declaration of a loss by the barratry of the master and mariners, and of course, there could be no recovery on that ground. The court of King's Bench unanimously determined in that case, that there could be no recovery against the defendant. The judges expressly maintained the right of search, and that resistance to such right was unlawful. On no other ground could judgment have been given in favour of the defendant, the underwriter.

The case of *Saloucci* v. *Johnson*, where the right of search seems to be questioned, mentioned in *Park* 364. and in *Marshall* 301. was taken up and commented on by them; and they endeavoured to make out, that the case of *Garrels* v. *Kensington* was different, they overruled the doctrine laid down in the former case.

The right is also recognized in *Barker* v. *Blakes*, 9 *East*, 292.

That this doctrine is founded on the law of nations, is proved by *Marshall*, in his treatise on insurance, from page 306 to 317, where, for this purpose, he refers to *Bynkershock* and *Vattel*, writers on the law of nations, as well as to the *Consolato del Mare*, which he says is "one of the most ancient collections of marine laws now extant."

The subject is also elucidated, and the question put beyond all doubt, by the judgments in the *English* court of admiralty, in the case of the ship *Maria*, 1 *Rob. Adm. Rep.* 287, one of the *Swedish* vessels sailing under the convoy of a *Swedish* frigate; which case is recited in the above pages in *Marshall's* treatise.

The right of search being established, the consequence necessarily follows, that resistance to this right is unlawful, and a breach of neutrality. The question, however, still remains, whether the act of resistance, as between the insurer and insured, shall be denominated barratry. It is said in

this case, and has been said in other cases of the like kind, that barratry always carries the idea of *fraud*, of *crime*, with it; and that also, to constitute barratry, it is essential, that the act or acts claimed to be barratrous, should not be done with a view to promote the interests of the owners, but to promote that which is diametrically opposite to it, to injure or destroy such interest: that the acts of resistance and rescuing, in the present case, must be supposed to be done for the benefit of the plaintiffs; and had there been no recapture, would undoubtedly have been approved by them; and consequently, that they were not barratrous. To prove this proposition, several authorities were cited, in which it had been determined, that a deviation for the purposes of trade was not barratry; for though such deviation was contrary to the orders of the owners, yet being avowedly for their benefit, it could not come under the denomination of barratry. The same authorities were also cited to prove, that there must be something *fraudulent*, something *criminal*, in the act or acts claimed to be barratrous, in order to make them so. Among the cases cited for this purpose, were *Stamma* v. *Brown*, 2 *Stra.* 1173. *Nutt* v. *Bourdieu*, 1 *Term Rep.* 323, and *Phyn* v. *Royal Exchange Assurance Company*, 7 *Term Rep.* 505.

I am of opinion, however, that the acts of resisting a search and rescuing the ship, in the present case, were barratrous acts. If it be a clear principle, that those acts were unlawful, as being contrary to the law of nations, it strikes me, the consequence must inevitably follow, that they were barratrous acts. I go upon the ground that they took place without the knowledge or consent of the plaintiffs; for so it appeared, and nothing contrary thereto was pretended. Let the right of search be once established, and all resistance to it, must, of course, be unlawful. For it is perfectly absurd to say, that one man may resist another cloathed with authority, in the legal exercise of that authority. Such resistance, then, being unlawful, must be denominated *criminal*; for, unless a forcible resistance to the legal exercise of a right, established by law, be criminal, I hardly know what is.

It will not do to say, that the unlawful acts of the master and mariners were the cause of the loss of the property insured, yet they were intended for the benefit of the plaintiffs, though unauthorized by them, and if so, were not barratrous. The point is, were they unlawful? Were they unauthorized? If so, a pretended intention of benefit to the plaintiffs will be unavailing.

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

But decided cases put the question beyond all doubt.

In *Moss* v. *Byrom*, 6 *Term Rep.* 383. it was determined, that where a captain took *Letters of Marque,* and deviated from his voyage to cruise for prizes, and actually took one, and carried it into *Bermuda,* and there libelled for the benefit of his owners and himself, but soon after, his own vessel was driven on shore and lost there, it was barratry in him; and on that ground, a recovery was had by the owners against the underwriters.

Cases may be cited, wherein it has been held, that a non-payment of duties by the master, which caused a seizure of the ship, was barratry.

But the case of *Earl and others* v. *Rowcroft,* 8 *East,* 126. *et seq.* I think, settles the present question. It was a case, in which precisely the same question did not come up, as came up in the present case, but the governing principles of it are the governing principles of this case. It was an action brought against the underwriter, " on a policy of insurance dated 23th *January,* 1804, on the ship *Anabella,* at and from *Liverpool* to the coast of *Africa,* during her stay and trade there, and to the port of sale in the *West Indies,* with liberty to exchange goods, &c., and the plaintiff averred a loss by the barratry of the master." The great question in the case was, whether the captain's trading at an enemy's port, by means of which the ship was captured by an *English* frigate, and condemned, and so lost to the insured, was barratry? It was very ably argued, and all the authorities were brought up, and the judgment was rendered against the underwriter. It is a pretty long case, and I shall barely cite a part of the opinion of lord *Ellenborough,* in which, principles are laid down, which, as I apprehend, must govern the present case.

VOL. V.                    B

His lordship says, " it has been strongly contended on the part of the defendant, that if the conduct of the master, though criminal in respect of the state, were in his opinion likely to advance his owner's interest, and intended by him to do so, it will not be barratry. But to this we cannot assent : for it is not for him to judge in cases not intrusted to his discretion, or to suppose that he is not breaking the trust reposed in him, but acting meritoriously, when he endeavours to advance the interest of his owners, by means which the law forbids, and which his owners, also must be taken to have forbidden, not only from what ought to be, and therefore, must be presumed to have been, their own sense of public duty, but also, from a consideration of the risk and loss likely to follow from the use of such means."

Indeed, in the case of *Saloucci* v. *Johnson,* heretofore referred to, the court in giving their opinion, as stated by *Marshall* in page 302. say, that a ship warranted neutral, must so conduct herself as not to forfeit her neutrality ; and, that if by the wilful act of the captain, she do this to the injury of the owners, it will amount to the offence of barratry." *Park* in his treatise, states it as the opinion of Mr. Justice *Buller* in that case, " that if the act of the captain in resisting the search of his ship, by a *Spanish* vessel at sea, had been a forfeiture of his neutrality, it would have been barratry."

Thus, in *Great-Britain,* I think, this question is settled.

In a case also, before the Supreme Court of *Pennsylvania,* reported in 2 *Binney,* 574 to 581. chief justice *Tilghman* gives a decided opinion, that rescuing a vessel is barratry. He says, " we have the opinion of judge *Buller,* that the act of a neutral master, which forfeits his neutrality, is barratry. It has not, I think, been contended by the defendant's counsel, that a rescue is not unlawful. On that point I agree with the opinion of judge *Washington,* in *Doederer* v. *The Delaware Insurance Company,* where he thus expresses himself : " That the attempt to rescue the vessel, was unlawful, and afforded a ground for condemnation, is proved by the opinion of the best informed jurists, and has received the sanction of the common law courts, in a variety of instances." He adds,

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

that this doctrine was admitted by the counsel of the assured." "Upon the whole," says chief justice *Tilghman*, "my opinion, formed, indeed, during the course of this trial, and therefore, not so much to be relied on, as if after argument in bank, is that if a rescue was committed, it was an act of barratry."

My opinion, therefore, is, that there ought to be no new trial.

In this opinion MITCHELL, Ch. J. SWIFT, TRUMBULL, EDMOND, SMITH, and BALDWIN, Js. severally concurred.

REEVE, J.  It is contended, that the recapture of the vessel was barratry, and on this account it was condemned; and thus a loss ensued to the owners, by this wrong act of the captain.  If the law was indeed so, that the rescue of the vessel was an unlawful act, and that every unlawful act of the master, by which loss ensues, is barratry, then the insurers are liable, aside from another consideration which I shall notice presently.  For argument's sake, I admit, that the master had no right to rescue the vessel; but I deny, that the consequence is, that the act done was barratry.

It is laid down by a writer of high authority in the mercantile world, that "*non omnis navarci culpa est barataria, sed solum tunc ea dicitur quando committitur cum præexistenti ejus machinatione et dolo præordinato ad casum.  Casaregis, dis.* 1. n. 77.

In *Phyn* v. *The Royal Exchange Assurance Company*, 7 *Term Rep.* 505. it is laid down by lord *Kenyon*, that a deviation, which occasioned the loss of the ship, although a wilful one, was not barratry, unless there was a fraudulent view in the captain at the time.  The case was, the captain's instructions were to proceed directly to *Jamaica* ; the ship was carried out of her reckoning, and was found to be between the *Grand Canary* and *Teneriffe*.  Her direct course to *Jamaica*, was south-west; but he bore away to *Santa Cruz*, which was north-west ; she was there embargoed, and, war breaking out betwixt *England* and *Spain*, she was made a

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

prize. The principle that governed in this, and all other cases, is, that if the probable consequence of the thing done, is not to endanger the property of the owners, there is no fraudulent view, nothing criminal towards the owners. The consequences of going to *Santa Cruz*, were not foreseen, nor could be conjectured with any probability of their occurrence. But whenever the probable consequences of the unlawful act done, will be a prejudice to the owners, although done with a view to their benefit as well as his own, it is barratry. This is deemed fraudulent, or to use a more appropriate term, criminal, towards the owners.

In *Moss* v. *Byrom*, 6 *Term Rep.* 379. a ship was chartered for a voyage from *Liverpool* to the *Bahamas* and back ; on the voyage to *Liverpool*, she took on board letters of marque, merely to entice seamen to enter, but without necessary documents to give them validity ; the master's written instructions were to sail directly to *Liverpool ;* he, however, cruized for prizes, and fell in with an *American,* and plundered her and then captured a *French* vessel, and sent her to *Bermuda,* and followed her there to procure her condemnation : during his stay, his ship was stranded, and cargo lost ; this was barratry, because, the plundering the *American* was prejudicial to the owners, and would subject them to loss. The cruising for the purpose of capturing, endangered the property of the owners, by falling in with a superior force. Every cruiser, in time of war, runs a risk of being taken, which risk is foreseen. The loss of the vessel and cargo, in this case, was not improbable, from such conduct.—In the case before stated, the conduct was such, that no probability of loss could have been conjectured, more in going to *Santa Cruz,* than to *Jamaica.*

We find, that the act done must be something of a criminal nature committed *against the owners.* The case of *Nutt* v. *Bourdieu,* 1 *Term Rep.* 323. demonstrates that an unlawful act as it respects others, not owners, does not constitute barratry. However unlawful it was, as it respects the captors in the present case, to recapture, yet it was not a criminal act towards the owners ; or in other words, the tendency of the

June, 1811.

Brown
v.
Union Insur-
ance Co.

act was not to destroy or injure the property of the owners, but to preserve it for them. It may be criminal enough against the captors to warrant a condemnation, and yet not be criminal, or any breach of trust towards the owners ; but on the contrary, it was done for their benefit, and the probable consequences of the act done must be considered as beneficial. No case will be found, I trust, in which it has been held to be barratry, where the act done was done for the benefit of the owners, and the probable consequences were, that it would be beneficial to them. I do not mean to be understood, that where the act done is with a view to the benefit of the owners, it may not be barratry, if the act is unlawful, and the probable consequences are, that injury will follow ; or the act is attended with great hazard to the property of the owners, and by that hazard the property is lost.

It has been determined, in *England*, that if a master sails out of port without paying duties, in consequence of which the ship is forfeited, this is barratry. Now, whether this was done for the benefit of the owners, or to save the duties to himself and charge them to the owners, does not appear ; as this kind of fraud is very common in that country, it is most likely this was the real fact ; it is direct fraud, and of course barratry. But suppose it was done for the benefit of the owners, yet it is barratry. It was a breach of trust in him, and the natural tendency of the act was loss ;—it was the probable consequence of the act.

In the case of *Vallejo* v. *Wheeler, Comp.* 153. where the master changed his course, and went a voyage to *Guernsey* for his own benefit only, and the ship was lost, it was held to be barratry. This was criminal to the owners; for without any view to their interest, but to his own only, he endangered their property, as every voyage does ; it was a fraud practised *upon them*.—But it ought to be remarked, that she was not lost on the voyage to *Guernsey*, but after she returned, and was pursuing her voyage, as directed by the owners : but barratry having been committed, the insurers were liable. So in the case before the court, if it was barratry to

the owners, that is, a crime committed against them, then, if the *British* had not retaken the vessel, but she had been destroyed by the perils of the sea, or tempest, on her voyage home, the insurers would be liable. Can any person conceive they would have been liable in that case? nay, barratry is a crime punished with great severity; and if this act was barratry, then the master, if he had arrived safe in port, would have committed a crime worthy of punishment. This is an idea wholly inadmissible. It is true this act of the captain turned out eventually to be against the interest of the owners, by the intervention of a re-capture, an event not foreseen, or probable; at any rate, the rescue of the ship had no tendency to produce the event.

In the case of *Phyn* v. *The Royal Exchange Assurance Company, 7 Term Rep.* 505. justice *Lawrence* says, " he knows of no case where it is said, that the act of the captain is barratry, because it is against the interest of the owners:"—" no," says he, " it must be done with a criminal intent;"—" and nothing can be clearer than that this criminal intent must respect the owners; it must be criminal towards them; and in this sense it is laid down by the whole court, that to constitute barratry, there must be fraud; and because there was none intended in that case, the court held that there was no barratry, although there was a wilful deviation, and no sufficient reason why it was made.

Sometimes, we find it laid down, that it is never barratry where the act was done with a view to benefit the owners. The jury was so directed by the court, in the case of passing by *Marseilles* to *Genoa*; but for this I do not contend. I know the courts have determined breaches of trust to be barratry, where the act done was with a view to benefit the owners. I would not, then, be supposed to rely on this opinion, in the present case :—and no man can read several of the reports, without perceiving that it was the opinion of the judge who tried the causes, that to constitute barratry, the act must be done with a view to injure the owners, or at least, that it would injure them. In the case of *Stamma* v. *Brown*, 2 *Stra.* 1173. lord chief justice *Lee* says, barratry must be *ex maleficio,*

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

with intent to destroy, waste, or embezzle the goods ; and of course, there appearing no such intent, notwithstanding the injury done, the act was held not to be barratry. A deviation, he says, with a view to burn, sink, destroy, &c. would be barratry.

But I do not rely on these opinions, though frequently to be found; for I admit, that although the master has no such object in view as to injure, nay, if he has a directly opposite object in view, *viz.* to benefit the owners; yet if he does an illegal act, the natural tendency of which is to expose to risk the owners' property, which is now in perfect safety, and the probable consequences of which would be loss, and loss ensues, it is barratry. On this ground, the case of *Earl* v. *Rowcroft*, 8 *East*, 126. can be supported. To risk a trade with the enemy forbidden by law, on a coast where the *British* constantly keep their cruisers, without the consent of their own- ers, and where there is no room to presume any, is putting to great hazard their property. This may well be consider- ed a breach of trust, and of course barratry. Lord *Ellenbo- rough*, in pronouncing the opinion of the court, observes, " that a disregard to laws by the master, will not constitute the act of barratry, unless they were such laws as the owners relied upon his observing." It was not the unlawful act of trading with an enemy, that of itself rendered it barratry, for it would not have been so, if the owners had directed him so to do ; for in that case, no fraud or imposition would have been practised on them ; but where no such orders were given, nothing can be more reasonable than to suppose, that they relied upon it, that he would not enter upon an unlawful traffic, and thus expose their property to such im- minent danger, which was safe whilst engaged in a lawful trade.

Is there in this case such a presumption, that the owners relied upon it, that if he, being neutral, with neutral property only, was captured, and on his way to port for adjudication, where experience has taught us there is so much risk of con- demnation, he would not embrace an opportunity to rescue their property, if an opportunity presented ? Would they

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

consider such an act as an imposition on them, and a breach of trust ? If it is not to be thus viewed, it is not barratry. The universal commendations bestowed by owners on their masters, when their property is in this way preserved, and the generous rewards that are frequently given to them for such acts, demonstrate that it is not viewed as an act that is fraudulent, and done with a criminal intent towards them.

The sense of mankind is better learnt from such transactions, than from any metaphysical disquisitions, forever unsatisfactory to every man whose mind is not darkened with scholastic jargon.

Had this vessel arrived safe, would it have entered into the mind of any man, that this transaction was barratry ? A criminal, fraudulent act, and a breach of trust ? And yet, it was as much so, as if she did not arrive safe. The true criterion is, as laid down by lord *Ellenborough*, that if the act done was an unlawful act, by which the property was endangered, and such an one as it was to be supposed the owners had confidence would never have been done, of which they could not approve, it is barratry ; for it is an imposition on them. But although the act is unlawful, and although the property is already in great danger, yet may probably be preserved, if the act done is such as it may be fairly presumed they approve, it is not barratry. If any man can conceive, that the rescue of a vessel and cargo proceeding to port for adjudication, belongs to the first class, he will consider this rescue as barratry ; but, if he believes it is an act which belongs to the second class, however unlawful it may be, he will never deem it barratry. If a certain conduct in a master, is generally viewed by mankind, and especially by owners, as commendable, and meets with general approbation, it would be a strange conclusion, in a particular case, to suppose such conduct in a master, should in that case, be considered a fraud upon them, and an act of barratry. I appeal to the numerous plaudits bestowed upon such conduct by owners, so often to be found in news-papers. I appeal to the many generous rewards bestowed for such conduct. Nothing can be more distant from the thoughts of

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

owners, than to condemn it as fraudulent and barratrous. It is the very thing, that could access have been had to them, they would have directed : It is the very thing their hearts would have approved of, if it had come to their knowledge before the re-capture. Shall they now be permitted to treat it as fraudulent, as in the case in 8 *East ?* On the ground that lord *Ellenborough* put that case, it is to be presumed, that the owners disapproved of such conduct, because it was unlawful, and of course, it was a fraud upon the owners. The presumption that the owners disapproved of that conduct, might be very reasonable, knowing that the trade with the enemy was illicit, and especially, as it respected the articles of traffic. The owners whose property was wholly secure, might have very strong objections to such trade, whereby their property was put to imminent hazard ; and had they been consulted, would have forbidden the act. How very different is this case ? The property was not safe : it was captured ; and experience had taught the owners, that condemnation frequently followed the capture ; so that the hazard of loss was imminent. This act delivered the vessel and cargo from the danger which then impended over it. A possible and remote hazard of recapture and condemnation still remained, which has been realized in this case ; but had the owners been consulted, the presumption is, that they would have sanctioned the act ; of course, no fraud could be practised upon them. I therefore, consider the defendants not liable on account of barratry.

It is contended, that whether it is barratry or not, it is a loss against which the insurance is made ; and therefore, on that ground, the insurers are liable. It will be remembered, that this insurance is not binding, unless the warranty of the plaintiffs, that the vessel and cargo were neutral, was complied with ; neither is it binding, unless the insured take care that he do not, by any act, forfeit his neutrality ; if he does, the policy is avoided, and there can be no recovery. There is no evidence but that this property was neutral property. I shall take it to be such ; but I hold, that there was a forfeiture of neutrality, by the rescue of the vessel.

VOL. V.                    C

The sentence of condemnation, on that ground, is conclusive evidence of the fact of the rescue ; and this depends upon the question, are neutral ships bound to submit to visitation and search ? On this subject, I entertain no doubt that they are ;—all I contend for is, that it is not barratry.

I find nothing in opposition to this opinion in the books, except only, an opinion expressed in the case of *Saloucci* v. *Johnson.* It must be admitted, that the opinion of the court was, that a neutral ship is not bound to submit to be searched. They also observe, that a ship is not bound farther than to notice the law of nations, and not the particular ordinances of other powers. This observation is doubtless correct ; and the sentence in the *Spanish* court, states, that the ship refused to be searched, and refused with force, having fired on the *Spanish* ship, contrary to the *Spanish* cruising orders. The court seem to suppose, that it was not, therefore, by the force of the law of nations, that she was condemned, but because she violated the cruising orders of *Spain* ; but if the cruising orders were in conformity to the law of nations, the resistance would be a forfeiture. The judgment in the case of *Saloucci* v. *Johnson,* it seems to me, may be correct, without adopting the opinion there adopted by the court, that a neutral is not obliged to submit to be searched. What is the sentence of the *Spanish* court ? That she had refused to be searched, and resisted with force, having fired upon the *Spanish* ship contrary to the cruising orders of *Spain.* It is not said in violation of her neutrality, or contrary to the law of nations. What is the evidence, which we have, that she refused to be searched, &c. ? The sentence tells us, because she fired upon a *Spanish* ship ; but is this conclusive evidence of a breach of neutrality ? Does not the master's answer repel the conclusion, that being hailed under false colours, he supposed that the *Spanish* ship was a *Barbary* corsair ? There is nothing in the sentence to contradict the idea ; and under such circumstances, it could be no breach of neutrality, or violation of the law of nations. All that is said, is, that it was contrary to the *Spanish* cruising orders. What they were does not appear in the sentence ; and if they were any

June, 1811.

BROWN
v.
UNION INSUR-
ANCE CO.

way different from the law of nations, they were not binding upon neutrals.

The opinion there given is a solitary one. All the writers that I have seen, recognize the right of search. *Grotius* and *Bynkershoek* speak of it as the known law of nations; and it seems to me idle to say, it being a matter of force, it may be resisted; for although it be a matter of force, yet it must be admitted, that it is lawful force. In all arrests, it is a matter of force; but to admit the idea, that therefore, the officer who arrests may be resisted, would be to introduce confusion, and subvert all regular government.

On this point, *Vattel*, a writer of the highest authority, is decided. He maintains the right of search in the belligerent, and lays it down as incontrovertible law, that a neutral ship which should resist such visitation, may be seized and condemned, on that account.

In the case of *Garrels* v. *Kensington*, 8 *Term Rep.* 230. the question is settled, that every belligerent cruiser has a right to visit and search a neutral, and that resistance to it is a forfeiture of neutrality. This is no new opinion, adopted to answer a particular purpose, but one that is perfectly conformable to the ancient and most approved authors on maritime law.

Such, also, is the decision in the case of the *Maria*, a *Swedish* vessel, reported in *Marshall on Insurance*, 311. *Vid.* 1 *Rob. Adm. Rep.* 287. A more luminous decision, and supported by more irrefragable arguments, I do not remember to have seen. I conclude, therefore, that the belligerent has a right to visit and search, and use the force necessary; and it being a lawful force, it cannot be lawfully resisted; and if resisted, it is a forfeiture of neutrality, and a good ground for condemnation; and by means whereof, the insured having, by their policy, warranted the property neutral, and by their own act, forfeited all benefit from that neutrality, cannot recover on the policy.

The only doubt that has arisen in my mind, in the investigation of this subject, is, whether the right of the belligerent extended any farther than to visit and search; provided no

property was found but neutral property ; and the attempt to send into port was of course unlawful. In such case, the point, however, was adjudged in the case of *Garrels* v. *Kensington,* which was the case of a ship with neutral property, captured and sent into port for adjudication, and rescued from the prize-master and seamen, put on board by the master and crew of the capturing ship, and again re-captured ; and for this rescue, the ship and cargo were condemned.

There is a point of light, in which I will endeavour to place this case, which, I apprehend, will demonstrate that the insurers are not liable ; that although the conduct of the master in rescuing this vessel might be considered as barratry in other cases, it could not be such in this case, as to render the insurers liable. What is the barratry in this case ? It is agreed, it was the rescue of the vessel ; thus forfeiting the benefit of neutrality, by which means the vessel was condemned. The ground taken then, is this ; the master's conduct was such, that he forfeited the benefits of neutrality. This was an unlawful act, and the very one by which the owners lost their property ; and of course, barratry. It is on this ground that it is contended, and it is the only ground upon which it can be contended, that the insurers are liable. We will for a moment advert to the policy. Upon what condition do the insurers warrant against the hazards mentioned in the policy ? On this, that the insured warrant, that their vessel and cargo are neutral, and that nothing shall be done that shall forfeit that neutrality ; for this is implied in all warranties, that the property is neutral ; and if an act is done that forfeits this neutrality, the insurers are discharged. And here the very thing is done, *viz.* the rescue of the vessel, which forfeits the benefits of neutrality ; and thus, the insurers are discharged. The same thing which it is contended is barratry, and subjects the insurers, is the very thing which, by the policy, it is agreed shall discharge the insurers. What is the language of the policy in the mouths of the parties ? Is it not this ; say the insurers to the insured, we will subscribe the policy, and insure against the hazards there named, provided you will engage, that the ship and

her cargo is neutral, and that no act shall be done which forfeits her neutrality. The insured answer to this, we agree; and the insured, accordingly, engage in the policy, that if any act is done, which is a forfeiture of the vessels' neutrality, they will have no claim against the insurers. An act is done which is a forfeiture of neutrality; yet the insured claim against the insurers; because they say, that this act is barratry, against which the insurers insured; or in other words, it is true we agreed never to call upon you, if a certain event took place. That event has taken place, and we call it barratry, and you are liable. Nothing can be more absurd than to suppose the parties contemplated the forfeiture of neutrality, as the barratry insured against; for this would be to suppose, that they had agreed that the insurers should not be liable, if there was a forfeiture of the neutral character; and at the same time agreed, that in that event, they should be holden. From the nature of these warranties, on the part of the insured, they are conditions precedent. No liability attaches on the insurers, unless these warranties are sacredly performed. It was, therefore, absolutely necessary, that the vessel and cargo should be neutral, and that this neutral character be preserved, or the insurers were not liable. The language of the policy, most manifestly is, in the mouth of the insurers, if you the insured, warrant the vessel and cargo to be neutral, and that she shall preserve her neutral character, we insure against barratry; but if you do not do this, we will not be liable. To this the insured agree, and put it on that ground, that ship and cargo are neutral, and will preserve a neutral character. Can it be conceived, that when she forfeits her neutral character, this is the barratry insured against? If it is, then the law is so, that the very act which releases the insurers from all liability, is the act which renders them liable.

BRAINARD, J. concurred in the opinion of judge *Reeve*.

New trial not to be granted.