# Phœnix Insurance Co. *v.* Moog.

### *Action on Policy of Marine Insurance.*

1. *Pleading over, after demurrer sustained; error without injury.*—After judgment on demurrer, pleading over is matter of right, and is not a waiver of the privilege of assigning the judgment on demurrer as error in the appellate court, unless the party has had the benefit of the demurrer on the trial of other equivalent issues (Code, § 3007); but, where it appears that the defendant, after demurrers sustained to his original pleas, had the full benefit of the same defense under amended pleas, the ruling on the demurrers, if erroneous, is error without injury.

2. *Sufficiency of complaint; negative averments of matters of defense.* In an action on a policy of marine insurance, a complaint which fully complies with all the requisites of the prescribed form given in the Code (p. 704, Form No. 16), is sufficient on demurrer, and it is not necessary that it should negative matters of defense.

3. *Plea of fraud.*—At common law, it was necessary, in a plea averring fraud, to state the facts constituting the supposed fraud; and this rule is unchanged by the statutory provision (Code, § 2987), that "the plea must consist of a succinct statement of the facts relied on."

4. *Pleading negligence.*—General averments of negligence, whether in a complaint or a plea, are not sufficient, unless accompanied with a statement of the facts from which the conclusion of negligence follows.

5. *Plea of fraudulent representation in procuring policy.*—In an action on a policy of marine insurance, a plea which avers that, "at the time said policy was obtained from this defendant, *it was fraudulently represented* to defendant that there was to be a much larger quantity of goods placed on board of said vessel by said plaintiffs, for said voyage, than was shipped upon her by them for said voyage," is defective on demurrer, because it does not allege the plaintiff's agency or complicity in the fraudulent representation.

6. *Fraud in procuring policy, or in making proof of loss.*—A policy of insurance, procured by a fraudulent misrepresentation or concealment of a material fact, affecting the risk assumed, is void, and no action will lie on it; but a fraudulent over-estimate of the plaintiff's loss, in making proof of loss to the insurer, does not affect the validity of the policy, nor destroy the right of action on it, unless the policy contains an express provision to that effect.

7. *Fraud in withholding part of insured cargo.*—Fraud in withholding a part of the goods insured as the cargo of the vessel, while it might reduce the amount of the plaintiff's recovery, would not vitiate the policy, nor destroy his right of action on it, unless perpetrated with his knowledge, or through his agency or connivance; and, therefore, a plea averring such fraud, but not alleging his knowledge, connivance, or agency, is demurrable.

8. *Barratry, as defense to action on policy.*—A plea averring that the vessel was destroyed by the willful act of the master in setting fire to it, with the design of defrauding the insurers, "for the benefit or ad-

[Phœnix Insurance Company v. Moog.]

vantage, not only of himself, but also of the plaintiffs," the owners of the insured cargo, is fatally defective on demurrer, since it does not show that the act was not barratrous.

9. *Same.*—When the master of a vessel is the sole owner of it, he can not commit an act of barratry by the willful destruction of the vessel; but, when he is only a part-owner, he may, by the willful destruction of the vessel, commit a barratrous act against the other part-owners of the vessel or cargo.

10. *Acts, admissions and declarations of co-conspirators, as evidence against each other.*—When two or more persons combine or associate together, for the prosecution of some fraudulent or illegal purpose, the acts and declarations of any one of them, made in furtherance of the common purpose, and forming a part of the *res gestæ*, are admissible as evidence against the others; *secus,* as to subsequent acts, admissions, or declarations.

11. *Same.*—To authorize the admission of such acts and declarations, as evidence against the other conspirators, a proper predicate must be first laid by the introduction of evidence *aliunde, prima facie* sufficient, in the opinion of the presiding judge, to establish the existence of such conspiracy; as in the analogous case of agency, where the acts or declarations of the agent are offered in evidence against the principal, and are only received when the fact of agency has been first *prima facie* established.

12. *Same ; fraudulent conspiracy against insurers.*—In an action on a policy of insurance on the cargo of a vessel which was wrecked and burned, one of the defenses being that the insurance was fraudulently effected on a fictitious cargo, some of the barrels insured as whiskey being filled only with water, and evidence having been introduced tending to establish that defense; a witness for the defense, having found some of the barrels filled with water, which bore the marks of the vessel, went to plaintiff's store, and talked with him about the barrels; but plaintiff manifested no interest in the matter, until informed that the barrels were filled with water, whereupon he consulted with his partner, and went out of the store, asking witness to await his return; and witness, after waiting for some time, went to another store in the neighborhood, telling plaintiff's clerk where he was going, and was soon joined there by plaintiff's brother-in-law, who was not present at said conversation between the witness and plaintiff, and who at once began to talk with witness about the barrels. *Held,* that these facts were sufficient, *prima facie,* to establish a conspiracy between the plaintiff and his brother-in-law, or the relation of principal and agent between them, and to render competent as evidence against the former. the proposition of the latter, in the ensuing conversation with the witness, to buy the barrels, or to destroy them.

13. *Spoliation of evidence.*—The spoliation of evidence, which is unfavorable to a party, may constitute a fraud, just as much as the manufacture of evidence that is favorable to him, and justifies the same presumptions against him.

14. *Objection to question and answer.*—When a question is propounded to a witness on the stand, which calls for evidence *prima facie* relevant and legal, the refusal of the court to allow it is an error which will work a reversal, although the answer, or proposed answer of the witness, is not stated; but, where the question is so general and indefinite that the answer may as well be irrelevant or illegal as relevant and legal, counsel must state the substance of the proposed answer, so that the court may see its materiality and legality, else error and injury are not shown.

15. *Same.*—When objection is made to a question, which is only illegal because it may elicit illegal testimony, and the answer is not set out, error and consequent injury can not be imputed to the allowance

[Phœnix Insurance Company v. Moog.]

of the question, since the answer may have been relevant, and even beneficial to the party objecting.

16. *Re-calling witness; what is revisable.*—A witness may be re-called, and re-examined as to the same matters concerning which he has already testified; but this is discretionary with the primary court, and its allowance or refusal is not revisable on error or appeal.

17. *Relevancy of evidence as to nature and value of insured cargo.*—The nature, quality and value of the insured cargo being a material inquiry, where the insurer contests his liability on the ground of fraud in pro-curing the insurance on a fictitious and over-valued cargo, evidence as to the contents of any part of the cargo saved from the wreck is rele-vant and admissible.

18. *Same.*—The fact that a party of men, visiting the wreck a few days after it was run aground, and breaking open the boxes of goods which composed the cargo, threw some of the canned goods overboard, does not tend to prove that such goods were worthless; and that fact not being competent evidence, their declarations accompanying the act are not admissible as evidence for any purpose.

19. *Impeaching witness by former deposition.*—When a witness is cross-examined as to former statements made by him in a deposition, with a view to impeaching him, and it is shown that he can not read, the deposition may be read to him, or the parts thereof as to which he is interrogated.

20. *Same.*—In impeaching a witness by proof of former contra-dictory statements, which he denies, qualifies, or explains, the impeach-ing witness may be asked whether he did not use the particular words imputed to him, or may be asked generally to state the conversation as it occurred; and if there is any material or substantial discrepancy be-tween the statements of the two witnesses, the testimony of the im-peaching witness can not be excluded.

21. *Charge as to construction of writing.*—A charge which refers to the jury the decision of a legal question—as, the construction of a char-ter-party, or other writing—is properly refused.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. WM. E. CLARKE.

This action was brought by A. & B. Moog, merchants in Mobile, suing as partners, against the Phœnix Insurance Com-pany; was commenced on the 24th April, 1882, and was founded on a policy of insurance for $12,500, which they had procured from the defendant on a cargo of merchandise shipped by them, *per* brig *Mary Allerton,* from Mobile to Galveston.

The original complaint contained two counts, in substance as follows: (1.) "Plaintiffs claim of defendant $12,500, with interest thereon from, to-wit, March 25th, 1882, the value of certain goods which the defendant, on the 30th November, 1881, insured against loss or injury, against perils of the seas, and of fire, and other perils in said policy mentioned, at and from the port of Mobile, Alabama, to the port of Galveston, Texas, on board the brig *Mary Allerton;* which goods were wholly lost by the burning and shipwreck of said vessel on her voyage, of which defendant has had notice." (2.) "Plain-tiffs claim the further sum of $12,500," &c., "on a policy of

insurance issued by defendant on the 30th November, 1881, in consideration of a certain premium paid to defendant by plaintiffs, on certain merchandise, the property of plaintiffs; by which policy the defendant insured the plaintiffs in the sum of $12,500, on said merchandise, against loss or injury against perils of the seas, and of fire, and other perils in said policy mentioned, at and from the port of Mobile," &c., "on board the brig *Mary Allerton ;* in case of loss, such loss to be paid in thirty days after proof of loss, and proof of interest in said merchandise. And plaintiffs aver, that said vessel was partially burned, and was shipwrecked on her said voyage, and that by reason thereof said merchandise was wholly lost and destroyed; and they further aver that said merchandise, at the time of said loss and destruction, was their property, and that they made to said defendant due proof of such loss, and of their interest in the said merchandise, on, to-wit, the 23d February, 1882; and they further aver that, on their part, they have complied with all the provisions of said policy of insurance." The defendant demurred to each count of the complaint, assigning as grounds of demurrer—1st, "that said count does not sufficiently allege or show that the alleged loss was caused by any of the perils alleged to have been insured against in said alleged policy;" 2d, "it does not sufficiently allege or show that said alleged loss occurred without fault on the part of said plaintiffs;" 3d, "because it is not sufficiently alleged or shown that said plaintiffs on their part complied fully with all the warranties and matters incumbent on them to be done or performed under their alleged contract of insurance." The court overruled the demurrers.

Two other counts were afterwards added to the complaint by amendment, each of which alleged that the policy insured against "perils of the seas, men of war, fires, enemies, pirates, rovers, thieves, jettisons, letters of mart and counter-mart, reprisals, takings at sea, arrests, restraints and detainments, of all kings, princes, or people, of whatsoever nature, condition or quality, barratry of the master and mariners, and all other perils, losses or misfortunes, that had or should come to the hurt, detriment or damage of the said merchandise;" that the merchandise was burned, sunk and wholly lost, by the burning and sinking of the vessel while on her voyage, and was the property of the plaintiffs at the time of the loss; that they made due proof of their loss and ownership, as required by the terms of the policy; that the value of the goods lost was more than $47,500, and that they had procured $35,000 of other insurance on the goods before obtaining the policy sued on, which bound the defendant, in the event of loss, to pay "only so much thereof as the amount of such prior insurance

might be deficient towards fully covering the property insured." The defendant demurred to each of these additional counts, assigning the following as grounds of demurrer to each: 1st, "because it does not allege that the goods, claimed to have been insured by the defendant on the said brig, were loaded on board of her for the said alleged voyage; 2d, "it does not allege that the goods, which are alleged to have been insured to the extent of $47,000, were all loaded on board of said brig for said voyage;" 3d, "it does not sufficiently allege that the alleged loss was caused by risks insured against in the said policy of this defendant;" 4th, "it does not sufficiently allege that the alleged loss occurred upon the voyage for which the said policy of this defendant is alleged to have been given." The court overruled the demurrers.

The defendant filed eighteen pleas; of which, issue was joined on the 1st, 2d, 3d and 6th, and demurrers were sustained to the others. The first plea was the general issue; the second was a general denial of the allegations of the complaint; the third alleged that "the loss of said goods was not occasioned by any of the perils insured against;" the sixth, that "the said vessel was not seaworthy at the commencement of the said alleged risk;" and the others were, in substance, as follows:

4. The loss of said goods "was caused by the misconduct of the master of the brig *Mary Allerton*, who was at the time a part-owner, or interested in the ownership of said brig." The demurrer to this plea was sustained on these grounds: 1st, "because said plea does not state the nature or character of the alleged misconduct of the master of said brig, nor the facts constituting the same;" 2d, "because it does not aver such alleged misconduct to have been intentional and wrongful in itself;" 3d, "because it does not allege said misconduct to have been fraudulent;" 4th, "because it does not aver that plaintiff procured, participated in, or consented to such misconduct."

5. The loss of said goods "was caused by the fraudulent and improper conduct of the master or crew of said brig, and such as was not insured against by this defendant." The demurrer to this plea was sustained, "because it does not state the nature or character of the fraudulent and improper conduct of the master or crew of said vessel, nor the facts constituting the same;" "because it does not aver that such fraudulent and improper conduct was procured, or participated in, or consented to by plaintiff;" and "because it does not aver any facts which make the plaintiff responsible for such fraudulent and improper conduct."

7. The policy sued on "was procured by fraudulent conduct and representation." The demurrer to this plea was sustained, "because said plea does not aver that the policy sued

on was obtained by the fraudulent conduct and representations of the plaintiffs, or of any one for whose conduct and representations plaintiffs are responsible;" and " because it does not state the nature or character of the alleged fraudulent conduct and representations, nor the facts establishing the same ;" and " because it does not aver that the defendant was induced by such fraudulent conduct and representations to issue said policy;" and " because it does not state facts establishing that such fraudulent conduct and representations were material to the risk taken by defendant."

8.　" At the time said policy was obtained from defendant, it was fraudulently represented to the defendant, or its agent, that there was to be a much larger quantity of goods placed on board said brig by plaintiffs, for said voyage, than was shipped upon her by them for said voyage." The demurrer to this plea was sustained on these grounds : " because it does not aver that the representation therein alleged was made by plaintiffs, or by any person thereunto authorized by them ;" " because it does not state facts going to show that such representation was material to the risk taken by the defendant ;" and " because it neither denies the allegations of the complaint, nor confesses and avoids the same."

9.　" The value, quantity and character of the goods laden on said brig for said voyage, by plaintiffs, have been largely and fraudulently over-estimated in the proofs of the loss furnished defendant." The demurrer to this plea was sustained, " on the ground that it does not aver that the fraud therein charged was procured, participated in, or consented to by the said plaintiffs ;" and " because it does not aver that there is any provision in said policy for an avoidance thereof by a fraudulent over-estimate in the proofs of loss, and of the value, quantity and character of the goods insured."

10.　" The goods which it was represented to defendant by plaintiffs were to be loaded on said vessel for said voyage, were not in fact loaded on said vessel for said voyage, and it was not intended by plaintiffs that they should be at the time said representations were made." The demurrer to this plea was sustained, " because it does not aver that the plaintiffs' merchandise was not insured and lost as averred in the complaint," and " because it does not state facts material to the risk taken by defendant in issuing the policy sued on."

11.　" The loss of said goods, if it occurred, was caused by fraudulent conduct on the part of the master or crew of the said vessel, with the knowledge or consent of the said plaintiffs." The demurrer to this plea was sustained, on the grounds : " because said plea does not aver that the fraudulent conduct on the part of the master or crew was with the knowl-

edge and consent of said plaintiffs; because the fact that such fraudulent conduct was with the knowledge of plaintiffs, is no defense to this action; and because said plea does not state the nature or character of such fraudulent conduct, nor the facts constituting the same."

12. At the time of procuring said policy of insurance from defendant, "plaintiffs wrongfully and improperly concealed from defendant the fact, which really existed, that said plaintiffs were procuring, or endeavoring to procure, policies of insurance on the cargo of said vessel amounting in the aggregate to $66,000, or thereabouts, when the goods laden, or to be laden on board, were not worth near that amount, and this was known to plaintiffs. The policies obtained by plaintiffs upon goods alleged to be on said brig for said voyage amounted to $66,000, or thereabouts, while the goods laden on board were not worth anywhere in the neighborhood of that amount." The demurrer to this plea was sustained, on these grounds: 1st, "because said plea does not aver that, at the time of procuring the policy sued on, plaintiffs had procured insurance upon the property so covered, in an amount exceeding, with the amount of said policy, the value of such property, and that such over-valuation was fraudulently made by plaintiffs, and concealed by them from defendant;" 2d, "because the concealment therein charged was not of a fact, but of an intention merely;" and, 3d, "because it does not aver that plaintiffs intentionally and fraudulently over-valued the property insured by the policy sued on, to obtain such policy."

13. "Only a part of the cargo pretended to have been shipped, or to be going on board of said vessel, for said voyage, by said plaintiffs, was really put on board of said brig; and this was done knowingly, and with the intent to defraud the underwriters, in the event of the loss of the vessel." The demurrer to this plea was sustained, "because it does not aver that the fraud therein charged was committed or participated in by plaintiffs;" and "because it does not aver that there was not merchandise on said brig of the value of $12,500, and insured and lost as stated in the complaint."

14. "There was fraud in the loading of the cargo on board of said vessel, with the knowledge and consent of said plaintiffs, and with the intent on their part to defraud the insurers." The demurrer to this plea was sustained, "because the same does not state the facts constituting the fraud therein charged."

15. "After the alleged loss of the said goods, and in the presentation of the proofs of the alleged loss to the defendant, large over-estimates of the quantity and value of the goods alleged to have been lost by said plaintiffs on said vessel were knowingly and fraudulently presented to this defendant."

The demurrer to this plea was sustained, "because it does not state that the fraud therein charged was committed or participated in by plaintiffs," and "because it does not aver that there is any provision in said policy for an avoidance thereof by a known and fraudulent over-estimate of the quantity and value of the goods alleged to have been lost."

16. "The loss of the said goods was occasioned by the fault of the assured themselves." The demurrer to this plea was sustained, "because said plea does not state the facts constituting the fault therein charged," and "because it does not aver that such fault was committed willfully, or fraudulently."

17. "The loss or destruction of said goods was caused by the wrongful act or acts of the master or crew of said brig, and not without fault on the part of the plaintiffs." The demurrer to this plea was sustained, on these grounds: 1st, "because said plea does not state the nature or character of the alleged wrongful act or acts of the master or crew, nor the facts constituting the same;" 2d, "because it does not aver such wrongful act or acts to have been committed fraudulently or willfully;" 3d, "because it does not aver that plaintiffs procured, participated in, or consented to such wrongful act or acts;" 4th, "because it does not aver the nature or character of the alleged fault of plaintiffs, nor the facts constituting the same;" 5th, "because it does not aver such fault to have been committed fraudulently or willfully."

18. "The said policy of insurance was made subject to a warranty by the assured that the defendant should be free from any claim for loss, damage or expense, arising from seizure, capture, detention, or their consequences, or the consequence of any hostile act, whether lawful or unlawful, of any government or states, or by unauthorized or lawless persons therein, or otherwise; and defendant avers that the loss of said goods, if any occurred, was caused by the act or acts of lawless persons, for which this defendant is not responsible." The demurrer to this plea was sustained, on these grounds: 1st, "because said plea does not state the nature or character of the alleged act or acts of lawless persons causing the loss sued for;" 2d, "because it does not set forth any facts showing such act or acts to have been hostile;" 3d, "because it does not state the names of such lawless persons, or otherwise identify them, nor state that the same are unknown to said defendant."

After the amendment of the complaint, the defendant filed twelve new or additional pleas "to each and every count of said complaint as amended;" and issue was joined on all of them, except the first and second, to which demurrers were sustained, and which were as follows: (1.) "*Actio non*," &c.,

" because it says the loss of said goods was not caused by any of the perils insured against, but by the willful misconduct of the master of said brig in intentionally setting fire to said brig, or causing fire to be set to the same, with the intention and design of thereby defrauding the underwriters, for the benefit or advantage, not only of himself, but also of the said plaintiffs." (2.) " The loss of said goods was not caused by any of the perils insured against, but by the willful misconduct of the master of said brig in intentionally setting fire, or causing fire to be set to the said brig, with the intention and design of thereby defrauding the underwriters; and defendant avers that the said master of said brig was, at the time of its being so set fire to, a part-owner of said brig, or interested in the ownership thereof."

The fourth additional plea, on which issue was joined, averred that the policy sued on " was procured by the false and fraudulent representation of plaintiffs to defendant's agent that they were going to ship $50,000 or $60,000 in value, or thereabouts, of goods upon said vessel for said voyage, and would get other insurance on said goods from other parties, all amounting in the aggregate to $60,000; that said policy was issued by this defendant upon this understanding and these representations; " that plaintiffs did procure other insurance to the amount of over $50,000, but did not ship goods on board of said vessel to the amount of $60,000, " and did not intend to ship any such quantity of goods on said vessel when they made such representations, and did not in fact ship goods of any kind exceeding $20,000 in value; and defendant avers that said representations were material to the said risk, and that they were fraudulently made by the plaintiffs to defendant's said agent, and with the intention and design of defrauding this defendant."

The fifth additional plea alleged, that the plaintiffs fraudulently concealed from defendant, at the time they procured said policy, the fact that they had procured, or intended to procure from other parties, insurance aggregating $60,000 on goods shipped or to be shipped on said vessel, when the goods actually shipped did not exceed $20,000 in value; that it was part of their fraudulent scheme to have the vessel burnt or destroyed, and then collect from the underwriters the full amount of all the policies; that this scheme was partly carried out, by procuring insurance on the goods to the amount of more than $60,000, when their value was not more than $20,000, and procuring the loss and destruction of the vessel and cargo, and that the suit was prosecuted in furtherance of this fraudulent scheme. The other additional pleas require no special notice.

[Phœnix Insurance Company v. Moog.]

On the trial, as appears from the bill of exceptions, the plaintiffs offered in evidence the policy of insurance on which the action was founded, and the charter-party which they had procured of the brig *Mary Allerton*, for a voyage from Mobile to Galveston, in December, 1881; and they offered evidence tending to show that the cargo shipped by them on said vessel was worth between $59,000 and $60,000, and also tending to show the loss and destruction of the vessel and cargo while on the voyage. The perils insured against by the policy were "of the seas, men of war, fires, enemies, pirates, rovers, thieves, jettisons, letters of mart and counter-mart, reprisals, taking at sea, arrests, restraints, and detainments of all kinds, princes or people, of whatever nation, condition or quality, barratry of the master and mariners, and all other perils, detriment or damage of the said goods and merchandise, or any part thereof." The charter-party, which was dated November 28th, 1881, provided for the "freighting and chartering of the whole of said vessel, with a full and complete cargo of assorted merchandise," from Mobile to Galveston, and further stipulated that "no goods or merchandise shall be laden on board, otherwise than from the said parties of the second part" (plaintiffs), "or agent." It was shown that the loading of the vessel was completed on the 16th December, and her hatches battened down on the 18th; that she started on her voyage that night, and proceeded about thirty miles down the bay, where, on account of the weather, she lay to until the morning of the 22d, when she resumed her voyage; that she was found, about midday, to be on fire in the hold, and was immediately turned about to return to Mobile; that she was run ashore "when three or four miles below the outer bar of Mobile Bay, on the eastern side of the channel, in an eastwardly direction from the light-house on Sand Island, where she burned to the water's edge, and the plaintiffs' goods on board were lost and destroyed." Plaintiffs also introduced evidence showing that they had leased a store in Galveston, Texas, for one year from the 1st September, 1881, and had formed a partnership with one Strauss to go into business there under the name of A. & B. Moog & Co. "Plaintiffs examined one Cleveland as a witness, who was their book-keeper, and asked him whether or not he knew anything of a box of stationery being ordered by them, before said vessel sailed, to be shipped by her to A. & B. Moog & Co. at Galveston. The defendant objected to this question, and to the answer thereto, as irrelevant, unless its relevancy was shown. Plaintiffs said, in reply, that they expected to show that a box, then in the court-room, contained such books and stationery, and that it came from the wreck of said vessel. The defendant still objected to the question and

answer, and excepted to the action of the court allowing the
same.    The witness stated, in reply to the question, that he
had ordered a set of books, &c., to go by the *Allerton* for said
A. & B. Moog & Co., and that the box in the court-room con-
tained those books and that stationery."

The defendant introduced evidence tending to show that a
barrel of turpentine and some bales of hay, which nowhere
appeared in the invoice or bill of lading, were shipped on
board of the vessel, and were used by the mate in setting fire
to it; "that the master stood by, gave directions in regard to
how the fire was to be set to her, saw it done, and approved of
its being done; and that one of the plaintiffs was frequently
at the vessel, and down in her hold, during the loading of the
cargo, and after the hay had been loaded on board."   On the
other hand, " there was evidence on the part of the plaintiffs,
tending to show that the hay was purchased by the master for
his own account, on his statement that he intended to bring
back some live-stock from Texas, and wanted the hay to feed
them; and that he was allowed by plaintiffs to store it in the
hold, on condition that he should take for them on deck some
freight that could not be put in the hold."   The defendant in-
troduced, also, evidence showing the large amount of insurance
which the plaintiffs had effected on the cargo of the vessel,
which purported to consist of whiskey, brandy, tobacco, cigars,
canned goods, &c.; and proved various circumstances tending
to show that the cargo was fictitious and fraudulent; as, that
some of the barrels washed ashore from the wreck, which pur-
ported to contain whiskey, were filled only with water; that
some of the boxes, marked as containing tobacco or cigars,
were empty, and others filled with worthless articles; that the
vessel did not draw as much as she would if fully loaded; that
she could not, by cubic measurement, carry as much as the
cargo would represent in size; that plaintiffs never, at any one
time, had more than $15,000 or $20,000 worth of goods in
their store, and never paid taxes on any more, &c.   In this
connection, a witness for the defendant testified, that he went
to the wreck of the vessel, on the 23d or 24th December, in a
boat with several other persons, and "found her pretty well
filled with water; that he tasted the contents of a number of
bottles taken from the wreck, marked whiskey, sherry, ma-
deira, &c., but it was more like sweetened water than anything
else, though several of his men got drunk and sick from the
effect of drinking the things they got from the wreck.   De-
fendant then asked said witness about the canned oysters gotten
from the wreck; to which he replied, that his men said they
were not good, and threw them overboard; that he thought
none of them were used, and saw some of them opened,—how

many he could not say, but perhaps not more than one; that he saw some of them thrown overboard; that some of the men, who were going to open and eat them, threw them overboard after opening them. Plaintiffs objected to this testimony as hearsay—what was said by another person in the presence of the witness; which objection the court sustained, and defendant excepted."

"The defendant introduced, also, evidence showing that one Henry Weil was a brother-in-law of one of the plaintiffs; that a few days after the wreck of the *Mary Allerton*, and after the prevalence of strong winds from the southward, many boxes and fragments of boxes, with the marks of fire on them, and some of them marked *A. & B. M.*, were strewn along the eastern shore as far as Point Clear; that a number of barrels, in good order, and not leaking, were also found along the shore, and some on Dixie Island, Sand Island, and Dauphin Island, which, when opened, were found to contain fresh water; that several whiskey barrels were picked up on the shore by John Pierce, two of which were found to contain fresh water; that said Henry Weil purchased these two barrels from Pierce, for ten dollars apiece, and the next morning these two barrels appeared to have been burnt near the spot where they were turned over to said Weil; that one Barado also picked up, about the same time, on said eastern shore, two other whiskey barrels in good order, which, upon being opened, were found to contain fresh water; and that thereupon said Weil purchased said barrels from Barado, for five dollars, and took possession of them." No objection was made to any part of this evidence. "Defendant introduced, also, one Louis Cook as a witness, who testified that, soon after the wreck of said vessel, probably about the 10th or 12th January, 1882, he went to plaintiffs' store in Mobile, and had a conversation with said B. Moog, about some barrels which had been picked up on the eastern shore, and which were supposed to have come from said vessel; that said Moog at first said they had no interest in the barrels, but, when witness was about to leave the store, and mentioned that about half of the barrels were filled with water, said Moog thereupon consulted with his co-plaintiff, and then asked witness to wait an hour for him at the store, and went out; that witness waited about an hour, and then started to leave, whereupon Lipman Moog, who was a half-brother of plaintiffs, and in their employment, came up, and asked him to wait longer; that witness declined to do this, but told him he was going to O. J. Hood's store, a short distance off on the same square; that witness then left, and went to said Hood's store, and while there, a short time afterwards, said Henry Weil, who had not been present at said conversation at plain-

tiffs' store, came to the door, and called him out. Defendant then proposed to ask said witness, what, if anything, then occurred between him and said Weil, in regard to said barrels. Plaintiffs objected to this question, and the court sustained the objection; to which ruling defendant excepted." Defendant then proposed to ask said witness the following questions: "Whether or not said Weil came to him after seeing said Moog, and said anything to him about barrels which witness had been talking to Moog about?" "Whether or not said Weil offered him any money for the barrels which witness had been talking about to Moog?" "Whether or not Weil, at that time, said anything about destroying water-barrels? and if he did, what he said?" "Whether or not said Weil went over to Baldwin county that evening?" "Whether or not he saw Weil a few days afterwards, on his return from Baldwin county? and if yea, what Weil said about his trip to Baldwin county?" To each of these questions the plaintiffs objected, and the court, sustained their objections; to which several rulings defendants reserved exceptions.

During the further progress of the trial, the defendant again offered to introduce said Louis Cook as a witness, and to prove by him, in addition to the facts before stated, "that said Weil, when he came up, commenced talking about the barrels witness had been talking about to said B. Moog, and wanted to know where they were; that witness would not tell him, unless paid for the information, and said he must have ten dollars for it; that Weil then asked him to wait a few minutes, until he came back, and left him; that Weil then left him, and went over to plaintiffs' store, but came back in a few minutes, and said that he had a schooner chartered to go over to the eastern shore, and asked witness to go with him and show him where the barrels were, and said he should have plenty to eat and drink, his expenses paid, and ten dollars besides; that Weil further said, that he did not care about barrels with whiskey in them, but wanted the barrels with water in them, to destroy them; that Weil went over to the eastern shore on the same day, on the steamboat *Annie*, and witness was on the wharf two or three days afterwards, and saw him coming back on her, and saw said B. Moog on the wharf at the same time." On objection by plaintiffs, "the court refused to allow defendant to make said proof by said Cook;" and defendant excepted.

One Bishop, a witness for defendant, had testified to finding a barrel filled with fresh water on the shore a few days after the wreck;" and defendant proposed to ask him, if he knew of any body coming into his neighborhood, and inquiring for goods which had come from the wreck? Plaintiffs objected to this, unless defendant specified the person or persons in-

quired about; and defendant thereupon asked, if said Henry Weil, or his brother Samuel, had been there making such inquiries. Plaintiffs objected to this question, and the court sustained the objection ; to which defendant excepted." One Rivers, another witness for defendant, had testified that he picked up several barrels filled with fresh water, and delivered them to a man who came there; " but he did not know who this man was, except from his own statement. Defendant then proposed to ask said witness, who the man said he was? and what, if anything, he did with the barrels?" The court sustained objections to each of these questions, " on the ground that defendant had not shown any connection of the plaintiffs with said person ;" to which ruling defendant excepted. B. Moog, one of the plaintiffs, was afterwards introduced as a witness for them, and testified that said Weil was not authorized by them to hunt up and destroy barrels from the wreck; and this evidence was admitted by the court, against the objection and exception of the defendant.

One Debby Campbell, another witness for defendant, who lived on the eastern shore near Rivers, testified that, a few days after Christmas, 1881, she and her husband picked up on the shore " some packages of goods, and among them a whiskey barrel, and that then a man, whom she knew to be Henry Weil, came after her to get this barrel." On cross-examination of this witness, " plaintiffs' counsel asked her, if her deposition in this case had not been taken at a certain time and place, and if she had not then said she saw a whole box of soap; to which she replied, yes. Defendant's counsel insisted that the witness be shown her deposition. The court allowed the question to be asked, and defendant excepted. Plaintiffs' counsel then read to the witness, from her deposition, her answer in which she made such statement, and asked her if she had not said that; to which she answered, that she had said it. Plaintiffs' counsel then handed her the deposition, and asked if she could read it ; and she said she could not."

The defendant requested the following charge to the jury : " If the jury find that the plaintiffs, by the charter-party, had obtained the control of the vessel, and the right to load her with merchandise on the insured voyage, they are responsible for all the goods that are shown to have been laden on her; and if there is found on the vessel, laden in its hold, articles of a character not consistent with the general character of the cargo, but fitted to aid in the destruction of the vessel, it furnishes a fact which the jury must consider upon the issues in this cause; and the jury must take such fact so proven, in connection with other facts and circumstances that have been proven in the case, and therefrom they are warranted, if their

[Phœnix Insurance Company v. Moog.]

judgment so approve, to determine whether there be or not any combination or understanding beween plaintiffs and other parties for the destruction of the vessel." The court refused this charge, and the defendant excepted.

There are forty-one assignments of error, embracing all the rulings of the court, adverse to the defendant, on the pleadings and evidence, and in the matter of charges given and refused.

D. C. ANDERSON, and HAMILTONS, for appellant, submitted printed arguments, in which they elaborately argued all the points presented by the assignments of error, and cited the following authorities: (1.) As to the sufficiency of the *complaint*, 2 Saund. Pl. & Ev., part 1, p. 223.

(2.) As to the sufficiency of the several *pleas averring fraud*, Emerigon, 290, 302; 1 Chitty's Pl. 613, mar.; 2 *Ib.* 414; 2 Arnould on Insurance, 1307, note; 62 Ala. 500; 1 Arnould, 487, 495; 1 Story, C. C. 57, 62; 1 Sumner, C. C. 451; 3 Kent, 283; 22 Pick. 203; Form No. 14, p. 703, Code of Alabama; 1 Wash. C. C. 93; 13 Mees. & W. 655; 1 Parsons, Mar. Ins. 532; 6 Ell. & Bl. 608.

(3.) On the question of *barratry*, 1 Parsons, Mar. Ins. 566; 4 T. R. 37; Cowper, 155; 19 Pick. 37; 12 Cush. 365; 2 Wash. C. C. 66; 1 T. R. 329-30; Emerigon, 347-8; 2 Arn. Ins. 772, 768, 832; 8 Cranch, 39, 50; 1 Phil. Ins. § 1082; 3 Caines' Rep. 1; 1 Johns. 229; 11 Mart. N. S. 630.

(4.) As to the evidence of *fraud*, 8 Porter, 72; 12 Ala. 80; 25 Ala. 174; 30 Ala. 436, 505; 23 Ala. 69; 23 How. 172; 61 Ala. 280; 63 Ala. 561, 567; 59 Ala. 205.

(5.) As to the evidence of *conspiracy*, and admissibility of acts and declarations of one conspirator or accomplice as evidence against the others, 4 East, 164, 171: 6 T. R. 528; 26 Ala. 47; 7 Wall. 132, 138; 7 Cowen, 445; 6 Mass. 75; 4 Wend. 261; 2 Day, 205; 2 Whart. Ev. § 1205; 4 Watts, 359; 7 Watts, 307; 74 Penn. St. 115; 3 Greenl. Ev. § 93; 7 Ala. 700, 458; 1 Ala. 83; 1 Md. 455, 474; 28 Ala. 677; 1 Stra. 144; 65 Ala. 542; Archb. Cr. Pl. 676; 2 Peters, 365; 43 N. H. 13; 2 Paige, 482, 488; 1 Rawle, 458; 13 Penn. St. 359; 56 Illinois, 218, 254; 75 Illinois, 309; 3 Whart. Amer. Cr. Law, §§ 2351–53.

(6.) As to the *declarations* of the persons throwing the canned goods overboard, 1 Greenl. Ev. § 108; 5 T. R. 512; 5 Greenl. R. 266; 1 Metc. 242; 3 Metc. 199; 21 Maine, 362; 3 Conn. 250; 9 Paige, 611; 8 N. H. 40; 8 Wall. 397–409.

J. L. & G. L. SMITH, and R. H. CLARKE, *contra*, also submitted printed arguments, in which they cited the following authorities: (1.) On the *pleadings*, Code of Alabama,

[Phœnix Insurance Company v. Moog.]

§§ 2979, 2987, p. 704; *Life Ins. Co. v. Bledsoe*, 52 Ala. 538, 546; *Herring v. Skaggs*, 73 Ala. 446; *Giles v. Williams*, 3 Ala. 316; *Clay v. Dennis*, 3 Ala. 375; *Hardy v. Br. Bank*, 15 Ala. 722; *Flewellen v. Crane*, 58 Ala. 627; *Day v. Huckabee*, 60 Ala. 425; 9 Co. 110; 1 Tyr. & Gr. 87; M. & R. 720; 2 Chitty's Pl. 414, 16th Amer. ed.; 2 Arnould's Ins. 1295, 1307, note; 11 Peters, 213; 1 H. & C. 454; 1 Parsons, Mar. Ins. 534, note; *Street v. Kelly*, 59 Ala. 355; Wood on Fire Insurance, § 429; 46 Indiana, 315; 5 Cranch, 100; 5 Har. & John. 138; *Foster v. Napier*, 73 Ala. 595.

(2.)  On the question of *barratry*, 1 Phill. Ins. §§ 1062, 1065; Abbott on Shipping, 183–4, mar., and note 2; *Jones v. Nicholson*, 10 Excheq. 28; 2 Selw. 976; 12 Cush. 360; 2 Parsons, Mar. Law, 243, note 4; 1 Parsons, Mar. Ins. 566, 571, note 4; Bell's Principles (Law of Scotland), 188.

(3.)  On question of *conspiracy*, *McAnally v. The State* ,74 Ala. 9; *Browning v. The State*, 30 Miss. 656; 1 Greenl. Ev. § 111; Wharton's Crim. Law, 261–2; 2 Bro. & Bing. 302; *Owens v. The State*, 74 Ala. 401.

(4.)  Other rulings on evidence, *Railway Co. v. Kolb & Hardaway*, 73 Ala. 405; *Alexander v. Alexander*, 71 Ala. 295; *Allen v. The State*, 73 Ala. 73; *Burns v. The State*, 49 Ala. 373; *Gayle v. Bishop*, 14 Ala. 556; 1 Whart. Ev. §§ 552, 554, 561–2, 566, 574; 61 Ala. 252; *Fail & Miles v. McArthur*, 31 Ala. 26; *Tompkins v. Reynolds*, 17 Ala. 109; *Sylvester v. The State*, 71 Ala. 25; 1 Brick. Digest, 781, §§ 118, 120.

SOMERVILLE, J.—There are some important questions raised by the pleadings in this cause, which we proceed first to consider, before undertaking the examination of those suggested by the bill of exceptions.

1.  It is provided by statute in this State, that the party against whom a judgment on demurrer is rendered may plead over as a matter of right, without waiving his privilege of assigning the judgment on demurrer as error in the appellate court, "unless he has subsequently had the benefit secured by the demurrer upon the trial of other equivalent issues." Code, 1876, § 3007.  Where it appears, therefore, that a defendant has gotten, under his amended pleas, the full benefit of any defense which he could also have obtained under his original pleas, to which the court has sustained a demurrer, the ruling of the court, if erroneous, is error without injury, because the defendant has suffered no prejudice by it.  This principle becomes important in the progress of the views which we shall see fit to take of some of the rulings of the

Circuit Court on the plaintiffs' demurrers to the defendant's pleas.

2. The present action is one on a policy of insurance, in which the plaintiffs sue for the value of certain goods alleged to have been lost on board of the brig *Mary Allerton*, while sailing between the ports of Mobile, Alabama, and Galveston, Texas. The Code prescribes a form of complaint for suits of this nature, which is found on page 704, among the schedule of forms of pleadings in civil proceedings.—Code, 1876, § 3009, p. 704, Form No. 16. The most casual observation will show, that the several counts of the complaint in the present cause comply fully with every requisite of this form, some of them being more detailed in their statements than the statutory form requires. It is manifest, therefore, that the demurrers to the complaint were properly overruled, the supposed defects suggested being mere matters of defense to the action.

3. Many of the defendant's pleas set up the defense of the fraudulent conduct of the master and the crew of the vessel, and the fraud of the plaintiffs in procuring the policy, and in loading the cargo. The fifth plea, for example, makes the general averment, that " the loss of said goods was caused by *the fraudulent and improper conduct* of the master or crew of said brig, and such as was not insured against by said defendant;" and the seventh plea alleges, that " the policy which the plaintiffs obtained from the defendant was procured by *fraudulent conduct* and representations." So, the averment of the fourteenth is, that " there was fraud in the loading of the cargo," without any statement of the facts constituting such fraud. The court sustained demurrers to these pleas, and several others of like character ; and these rulings of the court are assigned as error by the appellant, among many others. The question raised is, whether, under our present system of pleadings as established by the Code, a defendant in a court of law can plead fraud, or other analogous defense in the nature of fraud, by general averment, without a statement of the facts constituting the fraud. There can be, in our opinion, no doubt as to what the rule of the common law was on this subject. A plea, under that system, according to the better view, was required to state the facts which constituted the alleged fraud, or it was deemed demurrable. This was decided in *Giles v. Williams*, 3 Ala. 316, where the form found in Chitty, which is cited as authority by appellant's counsel, was expressly repudiated, as unsupported by authority ; the court there holding a plea insufficient, which averred that the bond sued on " was obtained by fraud, covin and misrepresentation " on the part of the plaintiff. This ruling was followed in *Clay*

[Phœnix Insurance Company v. Moog.]

*v. Dennis*, 3 Ala. 375, where a plea, which alleged that the note sued on was given for certain property, the sale of which was fraudulently made by the plaintiff to the defendant, was held insufficient; ORMOND, J., observing, that "a plea alleging fraud must state the facts which constitute the fraud." To the same effect is *McKeagg v. Collehan*, 13 Ala. 828, where this court held a plea to be bad, which alleged that a certain receipt, executed in satisfaction of a judgment in defendant's favor, was "obtained by fraud in the sale of a horse" to him by the plaintiff. The vice of the plea was held to be in the statement of a legal conclusion, "without setting out the facts from which such conclusion arises." We are not aware of any case where the doctrine of these decisions has been departed from, either before or since the inauguration of our present system of Code pleadings. The statute now declares, that "the plea must consist of a succinct statement of the *facts* relied on, in bar or abatement of the suit, and no objection can be taken thereto, if *the facts* are so stated that a material issue can be taken thereon."—Code, 1876, § 2987. In *Meadows v. Meadows*, 73 Ala. 356, 358, we said: "Facts, and not mere inferences, arguments and deductions, are required to be alleged in pleadings under the Code, as well as at common law, although the strictness of the ancient rule has been greatly relaxed." And again in *Quarles v. Campbell*, 72 Ala. 64, the following language was used in the discussion of this subject. Of course, all pleadings, which conform substantially to the *forms* prescribed by the Code, would be sufficient; and there are cases where the averments of conclusions, in the nature of mixed questions of law and fact, have been sustained by analogy." We find no form of plea in our present Code, which, upon any principle of analogy, will justify a plea of fraud, which omits to state any matter of fact constituting such fraud. As said in *Flewellen v. Crane*, 58 Ala. 627, 629,—an observation holding good since as well as prior to the Code: "Fraud is a conclusion of law from facts stated and proved. When it is pleaded, at law, or in equity, the facts out of which it is supposed to arise must be stated; a mere general averment, without such facts, is not sufficient. The court can not, on such averment, pronounce judgment." The same in substance is reiterated in *Pickett v. Pipkin*, 64 Ala. 520, 523.

4. Precisely the same principle applies to averments of negligence, whether urged by way of defense, or in maintenance of an action. It is not sufficient to aver mere conclusions of law—the facts must be averred from which the conclusion of negligence is deducible.—*City Council of Montgomery v. Gil-*

*mer*, 33 Ala. 116, 130; *Mobile & Montgomery Railway Co. v. Crenshaw*, 65 Ala. 566.

Under this principle, the plaintiffs' demurrers were properly sustained to pleas numbered as follows—the fourth, fifth, seventh, eleventh, fourteenth, sixteenth and seventeenth. We need not discuss other grounds, upon which the demurrers to these pleas may have been correctly sustained.

5. The eighth plea was plainly defective, in failing to show the complicity of the plaintiffs, in any manner, with the alleged fraudulent misrepresentation, *Non constat*, it may not have been made by a perfect stranger.

6. If a policy of insurance is procured to be issued by fraudulent misrepresentation or concealment of a material fact affecting the risk assumed, the contract will, of course, be void, and no action will lie on the policy. But a fraudulent over-estimate of the plaintiffs' loss, in making the proof of loss required by the insurer, will not operate to forfeit his rights under the policy, unless the instrument itself stipulates for such forfeiture. The same rule applies here, as in suits on other contracts. The perjury, or other fraud of the plaintiff, subsequent to the contract, does not operate retrospectively to vitiate its original validity. He may, notwithstanding, recover such damages as he may show himself entitled to by satisfactory proof. In view of this principle, the ninth and fifteenth pleas of defendant, filed to the original complaint, were defective, in failing to aver that there was a stipulation in the policy, providing for a forfeiture in the event of the assured making a fraudulent over-estimate of value in his proof of loss.

The defendant had the full benefit of the fact set up in the tenth of the original pleas, under the fourth amended plea; and, waiving other objections urged, he has suffered no injury of which he can complain.—Code, 1876, § 3007; *Williams v. Ivey*, 37 Ala. 242. And so, we decline to consider the twelfth original plea, because the full benefit of it was obtained under the fifth amended plea;" and the eighteenth also, because the defense presented by it, if available at all, was necessarily covered by the more general averments of the third plea, upon which issues were joined by the plaintiffs, and under which evidence was introduced raising the same questions of law and fact.

7. The fraudulent withholding, or conversion of a part of the cargo alleged to have been shipped, without the agency or connivance of the plaintiffs, would be no defense to the present action, but would only be effective to diminish the amount of the recovery *pro tanto*. The demurrer to the thirteenth plea was properly sustained, because of its failure to allege such agency or connivance.

[Phœnix Insurance Company v. Moog.]

8. The question of chief importance raised by the rulings on demurrer to the amended pleas, is one relating to *barratry*. It is averred in the first plea, that the loss of the goods insured by defendant was caused by the willful misconduct of the master of the vessel in setting fire to it, with the design of "defrauding the underwriters, for the benefit or advantage, not only of himself, but also of the plaintiffs." The second plea avers substantially the same thing, with the further allegation, that the master was, at the time of his alleged criminal conduct, a *part-owner* of the vessel.

We have no difficulty on the point presented by the first plea, to which, we think, the plaintiffs' demurrer was properly sustained; the rule being settled, that an act of the master, or of his marines, if one of fraudulent misconduct, may be *barratry*, as said by Mr. Addison, although it was done by them with no view of benefiting themselves, "but of securing some advantage for the ship-owners."—3 Add. Contr. (Amer. Ed.), § 1168, p. 226, and cases cited, *note* (a). On the same principle, a motive to benefit the owners of the cargo would not change the nature of the act, unless the misconduct of the barrators was perpetrated with the consent or connivance of the assured. It was said in *Brown v. Union Ins. Co.* (5 Day, 1; s. c., 5 Amer. Rep. 123), that if the alleged barratrous act was unlawful, "a pretended intention of benefit to the plaintiffs will be unavailing," and that "the decided cases put this question beyond all doubt." See, also, Parsons Mer. Law, 448; *Wiggins v. Amory*, 7 Amer. Dec. 175.

9. A question of more difficulty is that raised by the second plea. Can the master of a vessel, who is also a *part-owner*, commit the act of *barratry* by making way with such vessel in fraud of the other owners?

*Barratry* may be properly defined as "any illegal, fraudulent, or knavish conduct of the master or mariners of a ship, by which the freighters or owner are injured."—1 Rapalje & Lawrence's, Law Dict., p. 116; 1 Bouv. Law Dict., 232; 1 Phil. on Ins., § 1062. It has sometimes been said to be synonymous with the terms "villainy, knavery, cheat, malversation, trick, device, deceit or fraud" of the master or mariners. *Hood v. Nesbit* (2 Dall. 137), 1 Amer. Dec. 265, 267. It covers cases of injury to the shippers of the cargo, as well as the owners of the vessel (*Cook v. Commercial Ins. Co.*, 11 John. 40); and has often been adjudged to include losses by theft and embezzlement committed by the master or crew.—*American Ins. Co. v. Bryan*, 37 Amer. Dec. 278, and *note*, p. 285. And while it is immaterial that the master may have had in view the benefit of the owner, rather than his own, it may be considered there can be no case of *barratry* without the element of

fraud or criminal conduct of the master or the mariners. In *Wiggins v. Amory,* 7 Amer. Dec. 175 (s. c., 14 Mass. 1), Chief-Justice Parker said, that it might be taken as the settled law of England, that *fraud* or *criminality* is essential to *barratry.* And such now seems the settled rule also in this country.—*Hood v. Nesbit,* 1 Amer. Dec. 265, *supra.*

It is thus manifest, that the act of *barratry* can be committed by no other person except the master or mariners, and against no one except the *owner* of the ship, or the freighters, who are deemed owners *pro hac vice.* When the master, therefore, is also the *sole* owner, it is everywhere conceded that he can not commit an act of *barratry* against himself.—Smith's Mer. Law, 345 ; *Ross v. Hunter,* 4 T. R. 33. The obvious reason upon which this rule is based seems to be, that one can not commit a fraud, or other like unlawful act, upon or against himself. Upon no sound principle, therefore, can it be made to embrace the case of a mere *part-owner,* who very clearly can commit a fraud, cheat, or other illegal act of knavery, upon the property rights of his co-owners. The statement, however, is found in some of the old text-writers, that the master, if he be a part-owner, can not commit *barratry,* any more than if he were a sole owner.—2 Arn. on Ins. 837 ; 1 Phil. on Ins., § 1082. The case of *Wilson v. General Ins. Co.,* 12 Cush. 360, decided by the Supreme Court of Massachusetts, in the year 1853, and holding to this view, was based confessedly on these old authorities ; but it was admitted by Chief-Justice Shaw, that the adjudged cases confined the principle exclusively to sole owners. That learned judge, as he states in his opinion, was "not aware of any decided case directly in point," nor did he cite any, either American or English. The well considered case of *Jones v. Nicholson,* 10 Exch. 28 (26 Eng. L. & Eq. 542), decided by the English Court of Exchequer in the year 1854, had not then been promulgated. It was there held, that a master, who is part-owner, may commit *barratry* against the other part-owners ; and this, in our opinion, announces the proper rule—one which has been followed since in both England and Scotland, and is approved by the best of modern text-writers in England and America. In *Jones v. Nicholson, supra,* it was said by Pollock, C. B. : "Some expressions of modern authors to the contrary have been cited ; but they are, in truth, no authority whatever, since the doctrine laid down is not supported by any decided case. A master who is sole owner can not commit *barratry,* because he can not commit a fraud against himself ; but there is no reason why the fact of a master being a part-owner should prevent the other part-owners from insuring their interest in the ship, or the freighters from insuring their goods. If a master, being part-owner, in fraud

[Phœnix Insurance Company v. Moog.]

of the other owners, makes away with the ship, that, in my opinion, is *barratry*. The whole principle on which the doctrine rests supports that view." ALDERSON, B., said he was of the same opinion; adding, that "if the master, being himself a part-owner, commits the *barratry*, that is equally a fraud upon the other part-owners. Whenever it is a fraudulent act on the part of the master, it is *barratry;* but it can not be a fraudulent act when he is sole owner." PLATT, B., said: "Because the master happens to be a part-owner, how can it be said that the *barratry* committed by him is not a fraud against the other owners, who have separate shares in the vessel?"

The doctrine of this case is indorsed by Mr. Addison, in his learned treatise on Contracts, in which, discussing the laws of marine insurance, he observes as follows: "A master who is a sole owner can not commit *barratry*, because he can not commit a fraud against himself; but, if a master, being also part-owner, makes way with the ship in fraud of the other owners, that is *barratry*." In support of this view he cites *Jones v. Nicholson, supra;* 3 Add. Contr. (Amer. Ed.) § 1168, p. 227. Mr. Parsons, in his work on Marine Insurance, published in 1868, inclines to the same view, thus abandoning the opposite opinion expressed by him many years previous in his treatise on Mercantile Law.—1 Parsons' Marine Ins. 571; 2 Parsons' Mer. Law, 243, *note* 4; Parsons' Mer. Law, 449.

As we have said, the doctrine settled in *Jones v. Nicholson, supra*, is, in our judgment, correct, and we adopt it as better consisting with reason, as well as being better supported by modern authority.

We proceed next to discuss the rulings of the court on the points raised in the bill of exceptions.

10. The question which has been argued most elaborately by appellant's counsel, both at the bar and in their briefs, is that involving the precise state of facts which will authorize the declarations and admissions of co-conspirators to be received in evidence against each other, and the inquiry as to what extent the conspiracy itself must first be proved *aliunde*. This argument has been directed chiefly to certain acts and declarations of one Henry Weil, an alleged co-conspirator with the plaintiffs in the matter of fraud charged against them, which acts and declarations were proposed to be proved by the witness Louis Cook, but were excluded by the court.

The law undoubtedly is, that where two or more persons combine or associate together for the prosecution of some fraudulent or illegal purpose, any act or declaration made by one of them, in furtherance of the common object, and forming a part of the *res gestæ*, may be given in evidence against the others. A just and well-settled distinction is thus preserved,

between admissions made in furtherance of a conspiracy, and admissions made after its close. One is coincident with, and explanatory of a progressing transaction, while the other is narrative only of a past transaction.—2 Whart. Ev. § 1206.

11. To authorize such declarations or admissions to be received, however, so as to affect co-conspirators, it is clear that certain proof must first be made *aliunde*, in establishment of the conspiracy itself. Nothing is more certain than the proposition, that the conspiracy can not be proved merely by the declarations. The rule is precisely analogous to that governing the admissions and declarations of agents, when offered in evidence against the principal. They can be received only when the agency itself is *prima facie* established; for, as said by Mr. Wharton, " to permit the proving of the agency by proving the declarations of the agent, would be assuming, without proof, that which is a pre-requisite to the admissibility of the declarations."—2 Whart. Ev. § 1183 ; *Street v. The State*, 43 Ala. 1.

The extent to which the conspiracy must first be proved, was considered by us in *McAnally's Case*, 74 Ala. 9, 16, which, in our opinion, states the correct rule. It was there said, that in order " to allow such testimony to go to the jury, a foundation must be laid by proof sufficient, in the opinion of the judge presiding, to establish, *prima facie*, the existence of such conspiracy." As expressed by an accurate author, in a recent treatise on the Law of Evidence, such declarations can not be received, " until the judge is satisfied that, apart from them, there are *prima facie* grounds for believing in the existence of the conspiracy to which they relate."—Stephens' Dig. Ev., Art. 4, p. 8. In other words, if the evidence already offered *aliunde* in proof of the conspiracy, or tending to prove it, is sufficient, in the opinion of the presiding judge, to authorize the jury to find in favor of the fact of its existence, this makes out a *prima facie* case, and lets in the declarations made by any co-conspirator during the pendency of the enterprise, and in furtherance of its objects.—*Ormsby v. The People*, 53 N. Y. 472 ; 1 Greenl. Ev. § 111.

12. In view of these principles, we are of opinion, after much deliberation on the subject, that the evidence sought to be elicited from the witness Louis Cook, taken in connection with the other facts in proof, was sufficient to establish a *prima facie* case of conspiracy between Henry Weil and the plaintiffs, and that the questions propounded were of such a character as that the exclusion of them by the court was error. One of the defenses to this action is a fraudulent conspiracy on the part of the plaintiffs to cheat the defendant by shipping a fictitious cargo, comparatively worthless in value, upon

which, by false representations, they had procured an over-insurance largely exaggerated. The evidence tended to establish the truth of this defense, and to show, among other alleged frauds, that the plaintiffs had filled a large number of barrels with river water, and insured them as whisky, or other spirituous liquors. The witness Cook went to the plaintiffs' store, and there had a conversation with B. Moog, one of the plaintiffs, about some of the barrels which were picked up on the eastern shore of Mobile Bay, and were supposed to have come from the wreck of the *Mary Allerton*—the vessel in which plaintiffs' goods were insured, and which had been wrecked a few weeks before. Moog appeared to manifest no interest in the matter, until he was informed that some of these barrels were filled with water, whereupon he consulted with his co-plaintiff, and then, asking the witness to wait at the store for him, left the store, and went out. The witness Cook waited about an hour, and, discovering that Moog did not return, he went over to the store of one Hood, near by, stating, at the time, to one Lipman Moog, an employee of plaintiffs, where he was going. Very soon, one Henry Weil, shown to be a brother-in-law of the plaintiffs, and *who was not present at the previous conversation* between Cook and Moog about the barrels, *went over to Hood's store, and called Cook out.* It was proposed here to show that Weil proceeded to discuss with Cook *the matter of these barrels*, concerning which he had been so recently talking to Moog, and to inquire whether he offered money for the barrels, or said anything about destroying such barrels. The question is, Was Weil *prima facie* the agent of Moog in this matter, and was he acting under his authority? How, it may be asked, did Weil know where the witness Cook was, and what interest did he have in negotiating for these barrels? And above all, from whom, save from Moog alone, could he have ascertained any thing about Cook's connection with, or knowledge of these barrels? He was not present at the interview between Cook and Moog at the store, and must have been informed as to this matter by some one. If Weil, after ascertaining Cook's whereabouts with such facility, did in fact take up the same conversation that was progressing with Moog, and which the latter had invited an opportunity to re-open, and did offer to buy, or propose to destroy these articles, which might justly be regarded as tokens of criminating evidence, these facts, in our opinion, would authorize a jury to conclude that Weil was the agent of Moog, sent to see Cook in furtherance of his principal's interests, and that he was, therefore, *prima facie* a co-conspirator, doing an act in obvious promotion of the alleged scheme of the plaintiffs to defraud the insurance company. The spoliation of evidence,

damaging to a litigant's cause, may constitute just as much of a fraud, as the manufacture of evidence that is favorable to it.

14. The exclusion of the several questions propounded by the defendant to the witness Cook was clearly erroneous. The true rule on this subject is as follows: If a question is propounded to a witness on the stand, the answer to which is *prima facie* relevant and legal testimony, and the court refuses to allow the witness to answer, this is error, for which a reversal will lie; for the reason, that "the injury to the party consists in the refusal of the court to permit the answer to be given, and he can do nothing more to prove the wrong done him than to show that he has asked a legal question, the answer to which, by the action of the court, was denied him." *Nailor v. Williams*, 8 Wall. 107. Where no answer is given by the witness, as in this case, this does not repel the presumption of injury, provided the question itself is sufficiently definite to indicate the nature of the answer sought to be elicited, and such answer is *prima facie* relevant, material, and otherwise legal.—*Roberts v. The State*, 68 Ala. 515. In such a case, it would add little or nothing to the enlightenment of the court, for the counsel to state what is proposed to be proved by the question, because this is shown by the question itself, so far as to justify the admissibility of the answer.

It is only when the question is so general in its nature, that the answer sought to be elicited may as well be *prima facie* irrelevant and illegal testimony, as relevant and legal, that the exclusion of the question, and the refusal of the court to allow the witness to answer it, will be regarded as free from error. It is reasonable, in this class of cases, to require the counsel to inform the court what is proposed to be proved, so that the court may see that he seeks to elicit testimony which is proper to be admitted, and not that which is improper.—*Allen v. The State*, 73 Ala. 23. If this is not done, it may be inferred by the court that, in view of the broad and comprehensive nature of the interrogatory, the answer of the witness might have been illegal, irrelevant, or even beneficial to the party. There should be no such presumption, however, in the first case, because the question is sufficiently narrow to preclude it, and the party has the legal right to examine the witness as to all relevant and legal matters within his knowledge. When the court denies this right—and refuses to permit its exercise—there is manifest error; and error imports the presumption of injury, unless it is clearly repelled. The adjudged cases in this State can all be harmonized, in our opinion, with this principle, although some expressions may be found which seem susceptible of a contrary construction.—*Burns v. The State*, 49 Ala.

[Phœnix Insurance Company v. Moog.]

370. However this may be, the rule above announced is, in our opinion, the correct one.

15. There is another class of cases, where a question is illegal only because it may elicit improper testimony, and the court permits it to be answered against the objection of the other party. Unless the answer itself is disclosed by the bill of exceptions, no error can be imputed to the court, because the answer may have been both relevant and beneficial to the objecting party.—*Nailor v. Williams*, 8 Wall. 107; *East Tenn. Railroad Co. v. Bayliss*, 74 Ala. 150; *Eagle & Phœnix Man. Co. v. Gibson*, 62 Ala. 369. So, when an objection to a question is overruled by the court, and the record fails to show what answer the witness made, if any, it has been held that the ruling of the primary court is not reviewable on, appeal. *Hughes v. The State*, 75 Ala. 31; *Jackson v. Clopton*, 66 Ala. 29.

We need make no special application of these principles to the assignments of error based on the action of the court in excluding the questions propounded to the witnesses Bishop and Rivers, as upon a new trial the questions can be readily framed so as to be brought within the rule.

16. In what we have said above, as to certain questions proposed to the witness Louis Cook, we have properly confined our observations to the first examination of this witness, as disclosed in the record. When, however, it was attempted to introduce him upon the stand a second time, another well-settled rule applied, which has received the sanction, not only of this court, but generally of the courts everywhere. This rule is, that, while a witness may be introduced on the stand a second time, and re-examined as to matters concerning which he has been already interrogated, this is a matter of practice within the control of the trial court; and being entirely discretionary, its refusal or allowance is not reviewable by this court.—*Hobbs v. The State*, 75 Ala. 1; *Bell v. The State*, 74 Ala. 420; *Gayle v. Bishop*, 14 Ala. 552; *State v. Marler*, 2 Ala. 43; 1 Whart. Ev. § 574. It is a fundamental principle, that where "any matter is left to the discretion of one judge, his discretion is not subject to be reversed or revised by another."—1 Greenl. Ev. § 431. The action of the circuit judge, therefore, in declining to allow the witness Cook to be introduced upon the stand a second time during the progress of the trial, and re-examined as to precisely the same subject-matters, was the exercise of a mere discretion, not subject to our review on appeal to this court.

17. We see no objection to the testimony elicited by the plaintiffs from the witness Cleveland, as to the box of stationery alleged to have been shipped on the vessel as a part of her

insured cargo. This box was not only shown to have consti-tuted a part of such cargo, the nature and value of which was an important subject of inquiry, but was recovered from the wreck, and was at the time of the trial in the possession of the plaintiffs.

18. The court, in our opinion, committed no error in ex-cluding the evidence as to the canned oysters gotten from the wreck of the vessel. We can not perceive the relevancy of the fact that the party of men who visited the wreck threw some of these goods over-board. In itself, the circumstance had no tendency to prove the quality of the goods; and the act being inadmissible, the accompanying declaration explanatory of it must be excluded as mere hearsay.

19. As it was made to appear that the witness Debby Camp-bell was unable to read her deposition, when handed to her during her cross-examination by plaintiffs' counsel, there can be no error in the course adopted of permitting to be read to her the portion of this testimony in reference to which it was proposed to interrogate.— *Wells v. The State*, 74 Ala. 21; 1 Greenl. Ev. §§ 463, 465; 1 Whart. Ev. §§ 555–6, 562.

20. The mode of examination adopted in the attempt to im-peach the witness Gayle, which was to show his contradictory statements made in presence of the witness King, seems to us to be free from all objection. The proper predicate having been first laid, by asking Gayle whether he had not, at a time and place specified, made certain statements to King, and this being denied by him, or else explained in a certain manner, it was competent to impeach him, by proof of other statements con-tradictory, or differing in any material phase of signification. It is proper practice, in such cases, either to ask the impeach-ing witness as to the particular words sought to be imputed to the witness whose veracity is assailed, or else to adopt the more liberal mode of asking him to state the true conversation be-tween the parties as it may really have occurred. In the *pres-ent* instance, we think the two statements proved were suffi-ciently contradictory to justify the refusal of the court to ex-clude them from the jury.

We have examined the other assignments of error based on the admissions of evidence, and, in our opinion, they are not well taken.

21. The charge requested by the defendant was obnoxious to several objections, which rendered its refusal free from error. It submitted to the jury the construction of the charter-party, which was a question exclusively for the determination of the court, and not of the jury. And it, moreover, authorized the jury to impute to this contract a meaning which was clearly erroneous.

[Renfro Bros. v. Goetter, Weil & Co.]

The judgment of the Circuit Court must, however, be reversed for the errors to which we have above alluded, which is accordingly done, and the cause is remanded for a new trial.